**TILBURY**

v.

**ROGERS, Regional Director, U. S. Department of Labor, et al.**

**MITCHELL, Secretary of Labor, U. S. Department of Labor**

v.

**TILBURY (two cases).**

Civ. Nos. 4004, 4040, 4052.

United States District Court,
W. D. Louisiana, Shreveport Division.

Aug. 4, 1954.

Robert G. Chandler, Shreveport, La., for M. A. Tilbury.

Stuart Rothman, Washington, D. C., Earl Street, T. Hagan Allin, Dallas, Tex., for James P. Mitchell, Secretary of Labor.

Frederick J. Stewart, Shreveport, La., for William A. Self and Jimmie Simmons.

DAWKINS, Jr., Chief Judge.

Almost in point here is Newton's third law of physics which holds that for every action there is an equal and opposite reaction. Launched with some sureness against several adversaries, an action for a Declaratory Judgment has brought forth a multipronged counterattack:

Asking that we declare his business and the work of a number of his employees not subject to the Fair Labor Standards Act,[1] M. A. Tilbury, d/b/a Tilbury's Southern Meat Company, in C.A. No. 4004 impleaded twelve of his employees, as well as the Local and Regional Directors of the Wage-Hour and Public Contracts Division of the Department of Labor. By consent these officials were dismissed from the suit as improper parties defendant.[2] Two of the employee-

defendants counterclaimed[3] for overtime pay, penalties and attorney's fees.

But Pandora's box still was not empty: In C.A. No. 4040, the Secretary of Labor sued Tilbury for a permanent injunction against further alleged violations of the Act; and in C.A. No. 4052, he claimed substantial overtime payments said to be due to four of the Tilbury employees who were impleaded in C.A. No. 4004. The remaining six employees have not appeared or made claims.

Inasmuch as the facts are equally applicable to all three actions, they were consolidated for trial and decision, with separate judgments, of course, to be rendered in each case. Since Tilbury is the named defendant in two of the three actions, and a defendant in counterclaims in the third, we shall refer to him, for convenience, as defendant.

He paid his employees straight weekly wages well above the minimum required by the Act. Admittedly, however, he did not compensate them for overtime, and until February 4th, 1953, did not keep proper records, believing that the Act was inapplicable to his operations. Since then he has complied with it fully in all respects, except it is contended he has not done so in connection with certain "incentive" payments, discussed infra.

The primary, the basic questions for resolution are whether 1) these employees were "engaged in commerce" or 2) in "production of goods for commerce," so as to come within the purview of the Act. 29 U.S.C.A. § 202. If either question is answered in the affirmative, the Act is applicable.

Defendant's business is wholesale distribution, entirely intrastate, of meat, meat products and by-products. His customers are restaurants, hotels and similar establishments, which order special cuts or types of meat that are prepared by his employees. Regularly each week he receives large shipments of these commodities from points outside Louisiana. A relatively small percentage of these

---

1. 29 U.S.C.A. § 201 et seq.

2. Rogers v. Skinner, 5 Cir., 201 F.2d 521.

3. 29 U.S.C.A. § 216(b).

(less than 4%) come directly to his place of business. Most come from packing plants in Shreveport. All such shipments, however, are delivered, unloaded and placed upon the floor of defendant's storage room by employees of the packers.

■ There is a dispute as to whether the shipments regularly are checked in and placed on shelves or hooks in the storage room by the butchers and boners for whom and by whom claims for overtime are here asserted, or whether this is done by the shop foreman or manager. We have concluded that it is the latter, not the former, whose duty it is and who regularly perform these tasks. Although two of the employee-claimants, McBride and Dyess, testified that they spend about two hours each week at such work (and it was stipulated that two others would testify likewise), we prefer to believe the testimony of Mr. Blalock, the shop foreman, to the effect that the butchers and boners are called upon to do this only on rare occasions, when both he and Mr. Johnson, the manager, are absent. He, unlike the claimants, has no direct interest in this litigation. His version is far more logical and likely businesswise than is theirs. We cannot say, therefore, that any *substantial* amount of work time was spent by the butchers and boners in checking or handling incoming shipments of meats. This must be shown before their work or wage payments become subject to the Act.[4] It is the nature and extent of their duties in this respect, not the character of defendant's business, which is controlling.[5] Furthermore, it is our opinion that the shipments had completed their interstate journey when they came to rest on defendant's storage room floor, having been placed there by the packers' employees. Accordingly, we hold that no proper basis has been established for application of the Act with regard to this type of work.

■■ There are other facts, however, which bring the duties and wages of these employees under the Act: Regularly and necessarily in the course of their employment, while preparing meats and meat cuts for defendant's customers, his butchers and boners handle or otherwise work upon bones and other inedibles which are a part of the meats bought by defendant from the packers.[6] Defendant regularly sells these, and they go directly or indirectly into interstate commerce in various forms such as animal food, etc. The parties have stipulated that defendant knew, or had reason to believe, these by-products would be shipped extra-state. Even without the stipulation, if defendant knew or had "reasonable grounds to anticipate"—and we think he did—that these inedibles would move into commerce, the Act would be applicable.[7]

■ This part of defendant's business, it is true, constitutes only .216 of 1% of his total dollar volume of sales, and 8.45% of the total tonnage of meat prod-

4. Divins v. Hazeltine Electronics Corp., 2 Cir., 163 F.2d 100; Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Skidmore v. John J. Casale, Inc., 2 Cir., 160 F.2d 527.

5. Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656.

6. This is "production of goods for commerce". See Walling v. Peoples Packing Co., 10 Cir., 132 F.2d 236, and authorities therein cited.

7. "In determining the coverage of the Act, a manufacturer can not assume an attitude of detached aloofness from his product, ignoring the ultimate purpose or use for which it is intended. If he knows, or reasonably should know, that in the normal and ordinary course of business his product will move in interstate commerce, or if he intends or expects that it will so move, either alone or in connection with some other product, he is a producer of goods for commerce within the meaning of the Act. Actual knowledge that his product will so move is not essential. Nor is it of any consequence that the manufacturer's activities in connection with the product terminate before it moves in interstate commerce." Tobin v. Celery City Printing Co., 5 Cir., 197 F.2d 228, 229. See also Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83; D. A. Schulte, Inc., v. Gangi, 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114.

ucts sold. But that is not the governing factor, for the Supreme Court has held that the rule of *"de minimis"* has no application to cases of this kind.

"The Appellate Division applied the maxim *de minimis* to exclude respondent from the provisions of the Act. We think that was error. The Court indicated in National Labor Relations Board v. Fainblatt, 306 U.S. 601, 607, 59 S.Ct. 668, 672, 83 L.Ed. 1014, that the operation of the National Labor Relations Act (49 Stat. 449, 29 U.S.C. § 151, 29 U.S.C.A. § 151) was not dependent on 'any particular volume of commerce affected more than that to which courts would apply the maxim *de minimis.*' That Act, unlike the present one (Walling v. Jacksonville Paper Co., 317 U.S. 564, 570, 571, 63 S.Ct. 332, 336, 87 L.Ed. 460), regulates labor disputes 'affecting' commerce. 49 Stat. 450, 29 U.S.C. § 152, 29 U.S.C.A. § 152. We need not stop to consider what different scope, if any, the maxim *de minimis* might have in cases arising thereunder. Here, Congress had made no distinction on the basis of volume of business. By § 15(a) (1) 29 U.S.C.A. § 215(a) (1) it has made unlawful the shipment in commerce of '*any* goods in the production of which *any* employee was employed in violation of' the overtime and minimum wage requirements of the Act. Though we assume that sporadic or occasional shipments of insubstantial amounts of goods were not intended to be included in that prohibition, there is no warrant for assuming that regular shipments in commerce are to be included or excluded dependent on their size. * * * " Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511, 512, 90 L.Ed. 607.

In that case the White Plains Publishing Company regularly sent extrastate only one-half of 1% of its newspapers. We thoroughly disagree with this holding and believe Justice Murphy's dissent is correct, but we are bound to follow the interpretation of Congressional intent reached in the majority opinion.

■ Since practically all of the working time of defendant's butchers and boners is indirectly involved in the production of bones and other inedibles—this being "production of goods for commerce"—while they simultaneously and directly are preparing meat cuts for defendant's customers, we have no alternative but to hold that the work of these employees "in commerce" is "substantial", and their wage payments are subject to the Act.

Having arrived at that conclusion, we now consider the remaining factual and legal issues which proceed from it:

■ There is a dispute as to the exact number of hours worked each week by these employees. The Secretary and employee-claimants insist this amounted to as much as 63 hours, whereas defendant argues that they worked an average of 56 hours per week. We believe the latter's version is eminently correct. Prior to February 4th, 1953, no time cards were kept, but from that point forward they were. The employees admitted they worked the same number of hours before and since that date. They also admitted that defendant paid them for every hour they worked. The cards were prepared and kept current each day by the bookkeeper after receiving reports from the shop foreman. At the end of each week, when receiving their pay, the employees were shown the cards and required to sign them. In their testimony they expressly admitted that they make no claim of fraud, misrepresentation, error or duress in this respect. They conceded defendant's complete honesty. We are convinced that any other conclusion than that defendant's records are correct, and that his factual contention is correct, would be absurd. Accordingly, we find and hold that these employees worked an average 56-hour week during the period material to this litigation.

■ Beginning in early June 1953, and continuing until late November of

that year, defendant admittedly paid his employees an extra $10 per week. This amount was not considered by him in calculating overtime payments due. He contends this was simply a bonus, an extra incentive or inducement to a higher quality and quantity of work; therefore, that he owes nothing further for overtime. He does not argue that this was extra pay for overtime work. The Secretary and employee-counterclaimants contend, on the other hand, that defendant was required by law to add this to their regular base pay rates in figuring overtime payments due, since they worked more than 40 hours per week. The latter contention is correct.[8] These extra amounts during that period must be added to the regular 40-hour week base pay and from the total the hourly rate for overtime may be computed.

■ The Secretary insists he is entitled to the injunction against future violations prayed for in C.A. No. 4040. It is true, as he urges, that in the past defendant technically has been guilty of transgressing the Act in failing to keep proper records and in paying his employees a straight weekly wage, without regard to the overtime requirements of the Act. It is true also that defendant in these proceedings has contested applicability of the Act to his business and these employees. Yet, the record is convincing that his attitude resulted, not from a willful attempt at evasion or violation, but from the advice of his counsel, honestly given and accepted. After all, the question was far from clear. Our holding of liability under the Act was arrived at with difficulty and only after soul-searching study of the applicable authorities, with all of which we do not agree, but by which we are bound.

Defendant now is maintaining, and we believe he will continue to do so, entirely adequate and accurate work time-cards, with a time clock. Since February 4, 1953, he has been paying his employees wages in accordance with the Act, except for the "incentive" payments just discussed. As to these, we are sure he was in good faith. There is every reason to expect that in the future, and after he has paid the arrearages due, he will continue to comply with the law in all respects. In keeping with the judicial attitude found in Walling v. Youngerman-Reynolds Hardwood Co., Inc., 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705, and exercising the discretion with which we are vested, we must deny the prayer for an injunction.

■ Like observations and conclusions are applicable to the demand by the employee-claimants in C.A. No. 4004 for liquidated damages. We believe and find, as suggested by their counsel in brief, that a fair and adequate award would be 5% on the amounts owed them by defendant from their due dates until paid.

■ As to the counterclaim for attorney's fees in that action, we note the following: Their attorney prepared and filed for them an answer and counterclaim. He appeared in Court at a hearing on certain preliminary motions, but did not argue. He entered into a written, one-page stipulation with defendant's counsel. He attended the trial, which lasted about four or five hours, but took no active part in it, and questioned no witnesses. He offered no evidence as to the extent or value of his work. He filed three briefs of two or three pages each. For the most part, and with no reflection intended upon his energy or ability, we must say he "rode piggyback" on the arguments and briefs presented by the Secretary's counsel. For these efforts, all things considered, we feel that a fee of $350 will compensate him amply for his time and the results obtained.

Accordingly, there will be judgment in C.A. No. 4004 rejecting that plaintiff's demands in full. There will be further judgment against Mr. Tilbury and in fa-

8. Walling v. Harnischfeger Corp., 325 U. S. 427, 65 S.Ct. 1246, 89 L.Ed. 1711; Bibb Mfg. Co. v. Walling, 5 Cir., 164 F. 2d 179, certiorari denied, Bibb Manufacturing Co. v. McComb, 333 U.S. 836, 68 S.Ct. 607, 92 L.Ed. 1121.

vor of counterclaimants, Self and Simmons, for all amounts of overtime due, plus 5% thereon from the due date of each payment as liquidated damages, and an attorney's fee of $350. In C.A. No. 4040, there will be judgment in favor of defendant, rejecting plaintiff's demands. In C.A. No. 4052, there will be judgment for plaintiff and against defendant as demanded.

Proper decrees, in keeping with this opinion, should be presented for signature after the attorneys have calculated the correct amounts due.

This opinion will serve as our Findings of Fact and Conclusions of Law. Rule 52(a), Fed.Rules Civ.Proc., 28 U.S. C.A.